## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### (Alexandria Division)

| | | |
|---|---|---|
| **AGALAR ALIEV** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Civil Action No:_____ |
| | ) | |
| | ) | |
| **EXPERIAN INFORMATION** | ) | |
| **SOLUTIONS, INC.** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT

Plaintiff Agalar Aliev, by and through counsel, brings this Complaint against Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.      Mr. Aliev never visited the auto dealership that processed and sold a car loan contract for more than $68,000 in his name and using his social security number. This was not some sophisticated fraud perpetrated upon an unsuspecting car dealership, but rather one in which the dealership and its employees were familiar with the fraudster. In fact, just weeks before it had sold the fraudster one vehicle in his name and prepared a contract to sell him the vehicle in issue in his name. When financing for the second vehicle could not be approved in the fraudster's name, the dealership changed the name of the buyer to Agalar Aliev. The fraudster made some of the payments on the loan, but many of them were late. Less than one year after the sale, the vehicle was totaled, insurance paid the claims, but there was still a deficiency that was charged off and went to collections. Mr. Aliev was left with a defaulted car loan and a large personal property tax bill from the City of Alexandria. Once Mr. Aliev obtained the sales documents, it was abundantly

clear that the fraudster made no attempt to try and copy Mr. Aliev's signature and instead spelled out each letter of his name so that it was easily legible.  In an effort to clear his good name and remove this fraudulent account, Mr. Aliev began disputing the identity theft related account with Experian and asking it to remove the account from his Experian credit file.  Rather than follow the steps and guidelines established by Congress and the FCRA, Experian outsourced his disputes to third-party processors that are not authorized to even delete accounts that they believe are fraudulent or cannot be verified as accurate.  Instead, these third-party processors send a notice to the furnisher and whatever the furnisher says back in response is what Experian accepts and publishes.  Experian knows that the processes and procedures that the third-party outsourced processors follow are not in compliance with the instructions of §1681i, but they are cost effective.  Experian knows and has known for years, if not decades, that parroting and just adopting whatever a furnisher says is not an adequate or proper reinvestigation under §1681i and does not satisfy its grave obligations under the FCRA.  Accordingly, Mr. Aliev requests an award of actual damages, statutory damages, punitive damages, attorney's fees and costs based upon Experian's violations of the Fair Credit Reporting Act 15 U.S.C. §1681 *et seq.*

## Parties

2.      Plaintiff Agalar Aliev is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because he is an individual.  Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Agalar Aliev.

3.      Defendant Experian Information Solutions, Inc. (hereinafter "Experian"), is a foreign limited liability company with a principal office address in California.  Experian is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the

purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties. Experian regularly conducts these business activities in the Eastern District of Virginia by providing credit reports and other products to consumers and businesses in the Alexandria division of the Eastern District of Virginia.

## Jurisdiction & Venue

4.      This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681(p). Venue is proper in this jurisdiction. Plaintiff resides in the Alexandria Division of the Eastern District of Virginia and that forum is the forum most convenient for the adjudication of his claims.

## Factual Allegations

5.      On or about October 25, 2021, an identity thief went to Autos Direct of Fredericksburg, VA. ("ADF") and purportedly impersonated Agalar Aliev.

6.      ADF sold the identity thief a car and prepared a loan/retail installment sales contract.

7.      All of the signatures on the loan documents and other contractual agreements were forgeries and did not look anything like the signatures on Plaintiff's driver's license. Even an untrained eye could clearly see that they were obvious forgeries. Below is an example of the signatures from the purchase documents and below that is his driver's license with the signature provided.





8.      As is evident from the above documents, Mr. Aliev signs his name with a series of loops and there is no way anyone can look at that signature and decipher any of the letters or make out the spelling of the name.

9.      The car dealership that sold the truck (ADF) had sold the identity thief a different truck only a few weeks before this transaction in his actual name. ADF was well acquainted with the identity thief, having worked with him over multiple weeks to sell him two different vehicles. ADF has acknowledged that the thief was using an expired Maryland driver's license to purchase the first vehicle in violation of its own policies and procedures.

10.     The thief applied for a loan in his own name to purchase the truck in issue (second vehicle) and was denied financing. Next, he applied for a joint loan with Mr. Aliev and that too was denied. Finally, he applied for the vehicle in Mr. Aliev's sole name and that was approved.

11. ADF has admitted and acknowledged that multiple ADF procedures were violated in this transaction and that it could not identify one employee or witness that ever saw Mr. Aliev at this Fredericksburg car dealership.

12. The identity thief failed to make all the payments for the car, and it was eventually totaled by an insurance company. The identity thief worked to have the insurance companies pay

down the balance, presumably in an effort to cover the thief's tracks.  Unfortunately for Plaintiff, a deficiency balance remained on the account that the thief was not going to pay.

13. The furnisher for the account, Municipal Employees Credit Union of Baltimore ("MECU"), proceeded to report to Experian that this account was not only late, but ultimately charged off in May 2023 because even after the payment of the insurance policies a deficiency balance remained on the account.

14. On December 22, 2022, Experian sent a communication to Mr. Aliev that indicated he must send a police report for Experian to stop the credit reporting of the MECU account.  This letter is misleading because Experian equates a different portion of the statute related to the blocking of identity theft related accounts with its independent statutory duty to conduct a reinvestigation of a dispute account.  That same day, December 22, 2022, Experian added an initial security alert to Mr. Aliev's credit file because Experian knew that Mr. Aliev claimed to be a victim of identity theft.

15. On or about December 27, 2022, Mr. Aliev disputed the MECU account as fraud with Experian for identity theft.

16. Experian issued an ACDV to MECU dated December 27, 2022.   After MECU responded on January 11, 2023, Experian allowed the MECU account to remain on Mr. Aliev's credit file.  Experian had knowledge of the alleged theft of Mr. Aliev's identity because it knew from the credit dispute correspondence the issue and noted that Mr. Aliev believed, "THIS ACCCOUNT DOES NOT BELONG TO ME THE PERSON THAT GET (SIC) THIS CAR HAD MY OLD INFORMATION THIS PERSON NAME IS HAYDAR ALLAHVERDIYEV."

17. MECU responded to Experian's ACDV on January 11, 2023, and Experian simply parroted MECU's response because it does not conduct an independent reinvestigation of the

identity theft account and simply relied upon the ACDV exchange without conducting a meaningful independent reinvestigation.

18. Industry experts, like John Ultzheimer call the ACDV exchange investigation "a joke" because credit reporting agencies like Experian conduct no real independent reinvestigation of the identity theft related account. As discussed in Chapter 14 of his book *You're Nothing but a Number*, Mr. Ultzheimer describes how credit reporting agencies like Experian do not conduct a meaningful reinvestigation of consumer disputes:

> What do you think happens next? Is it assigned to a team of investigators who will spend time researching the information, interviewing people, or even looking at clues, all in an effort to determine the validity of the disputed account? Hardly. In what can only be categorized as "What a joke." The credit bureaus will send a letter back to the same lender who reported the disputed items, asking them to either verify that it is being reported correctly or change it. Remember. This is the same exact company that reported the information (possibly incorrect) in the first place. All the credit bureau is doing is essentially asking the lender of what it already reported is correct. That's not an investigation. All that is being verified is what the lender already has in its database, which might very well be incorrect. If the lender confirms that what they already sent is correct, then the information stays on file regardless if it is correct or not. What a joke.

John R. Ulzheimer, *You're Nothing but a Number*, p.102, (2007).

19. On August 1, 2023, Plaintiff mailed a credit dispute letter with supporting documentation to Experian via both certified mail and regular first-class mail. The supporting documentation included a letter detailing the circumstances related to the MECU account and the identity theft, a copy of his Virginia driver's license with signature, a copy of the retail installment sales contract with different signature, a copy of the buyer's order contract with different signature, and a statement of account from MECU. The totality of the documents demonstrated that Experian could never verify that that the MECU account should report on Mr. Aliev's Experian credit file and supported the conclusion that Mr. Aliev did not sign the paperwork to initiate the account transaction.

20. Experian received the August 1, 2023, credit dispute letter that Mr. Aliev mailed via certified mail on August 7, 2023.

21. On August 9, 2023, Experian issued another ACDV to MECU and stated that the consumer claimed identity theft and the account was fraudulently opened. As a result of this communication, Experian believed that Mr. Aliev was a victim of identity theft and communicated that belief to MECU. As part of the dispute reason and remarks of the ACDV, Experian communicated nothing to MECU other than the fact that Mr. Aliev believed the account was opened fraudulently.

22. MECU responded to the Experian ACDV on August 28, 2023, by updating some information related to the account. Experian received this response from MECU and immediately parroted the response by allowing the account to remain on Mr. Aliev's credit file. Experian has no direct evidence and can never produce any direct evidence that any agent ever reviewed and considered the factual allegations of the dispute that an identity thief opened the MECU account. The only evidence Experian will ever be able to identify is the limited fact that it received the letter, sent an ACDV to MECU, and parroted MECU's response. Experian does not retain any information to demonstrate that it reviewed or considered any information provided by Mr. Aliev or that Experian reviewed and considered any information provided by MECU. Experian recklessly disregards its statutorily required reinvestigation duties by implementing a mostly automated dispute system that it knows from other cases cannot properly reinvestigate identity theft disputes, also known as a "joke" investigation. By the very nature of identity theft, the account opening information will always match the victim's identifying information because that is what identity theft is: by definition. Only a careful factually based reinvestigation can determine if the victim really opened the account. Experian does not want to engage in this type of

reinvestigation because it would be too time-consuming and costly. As a result, they place their statutory burdens on the consumer and/or the furnisher to eliminate their statutory duties to conduct a reasonable reinvestigation upon receiving notice of a dispute.

23. Experian sent Mr. Aliev the results of the reinvestigation on August 29, 2023. Experian provided what at best could be described as confusing results of the reinvestigation. First, Experian stated that MECU requested that Mr. Aliev contact them directly. Given the fact that no one from Experian spoke to MECU, this statement is disingenuous at best. Next, Experian stated that the disputed item was not listed on the credit report, but Experian plainly contradicted its own statement because on page 3 of the dispute results, Experian stated that it verified and updated the credit reporting by allowing the defaulted and derogatory identity theft related MECU account to remain on Mr. Aliev's Experian credit file.

24. On or about September 28, 2023, Mr. Aliev issued another credit dispute letter to Experian in an effort to have the identity theft related MECU account removed from his credit report. The dispute letter included a copy of the signature line of the retail installment sales contract as well as a copy of the back of his Virginia driver's license that displayed his signature. The letter noted that the signatures do not match and that the signatures are not similar in any fashion. The letter went on to request a description of what Experian did to investigate the previous dispute, and it asks that a consumer statement be added to the credit file.

25. Part of that letter providing those documents included the below:



My signature does not look anything like those. This is the back of my driver's license and I already sent you a copy of this document. My signature is very compact and you cannot read the letters of my name. It is not even close to the fraudulent ones above.

26. Experian received the credit dispute letters on October 2, 2023 and October 3, 2023.

27. On October 5, 2023, Experian issued another ACDV to MECU. Once again, Experian communicated the dispute reason of "103-Consumer claims true identity fraud." Experian did not include any additional information in the remarks section of the ACDV, and there is no indication that any one from Experian reviewed or considered the factual circumstances detailed in the credit dispute letter or conduct any review or consideration of the signatures provided in the dispute letter on the driver's license or the retail installment sales contract.

28. On October 25, 2023, MECU responded to the ACDV by telling Experian to update some of the information related to the account. No documentary evidence exists that Experian ever reviewed or considered the ACDV response in conjunction with the information that Experian was provided in the credit dispute letter. Once again, Experian simply ignored its statutory duties

to review and consider the information and simply parroted MECU's response by allowing the identity theft related account to remain on Mr. Aliev's Experian credit file.

29. Experian sent Mr. Aliev the results of this reinvestigation on October 25, 2023.  As with the prior results of reinvestigation, Experian provided confusing results of the disputed item, claiming that it was not listed on the credit report.  Once again, these statements were not true because Experian stated on pages three of the results that it verified and updated the credit reporting by allowing the defaulted and derogatory identity theft related MECU account to remain on Mr. Aliev's Experian credit file.

30. At this juncture, Experian was a substantial factor in Mr. Aliev refraining from further attempts to obtain credit because Experian never removed the identity theft related MECU account from his Experian credit file after his credit disputes

31. At the time of his disputing the accounts, Experian caused Mr. Aliev significant distraction and time spent working on the identity theft related MECU account.  Mr. Aliev suffered a loss of free time, frustration, aggravation, worry, emotional distress damages, and physical manifestations of stress.

32. Given the egregious manner that Experian handled Mr. Aliev's credit disputes, punitive damages are necessary to deter Experian and force it to change its reinvestigation practices. Among the factors that support substantial punitive damages is that fact that Experian takes in immense revenue as a credit reporting agency, yet it refuses to allocate reasonable resources to process consumer disputes to ensure maximum possibly accuracy of its data.  According to Experian's website, the Consumer Services division contributes 20% to its global revenue.  In addition, Experian's website states that it had operating revenue of $4,861,000,000 in 2019.  *See* www.experianplc.com/investors/key-financial-data/.  Experian earns massive profits processing

and selling consumer data, but it refuses to take consumer accuracy disputes seriously as required by §1681i of the FCRA and instead outsources those duties to poorly trained and supervised processors to save money and further increase corporate profits.

33. Experian operates in the highly regulated industry of credit reporting that mandates high duties of care for accuracy and investigation. "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of case, set forth...in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681 i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1055874, at *4 (E.D. Va. Mar. 18, 2011).

34. Experian knows that it must conduct its own independent reinvestigation after receiving a notice of dispute from a consumer and that it cannot simply "parrot" the furnishers response and the reinvestigation "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220,225 (3d Cir. 1997). "[A] 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfil the obligations contemplated by the statute." *Id.*

35. Judge Trenga noted in the *Burke* case that Experian has a duty to conduct a reasonable reinvestigation under the FCRA and noted:

> While neither Section 1681e(b) nor 1681i(a)(1)(A) uses the term "investigation," it is clear from their explicit requirements that the obligation to conduct an investigation or reinvestigation that is reasonable under the circumstances is central to Experian's duty of care under the FRCA. This conclusion flows from the plain meaning of both sections. For example, Section 1681 e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived ..." *Id.* at 1396, 1771. It is difficult to imagine how

"maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681 i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke v. Experian Info. Sols., Inc.*, 2011 WL 1055874, at *4 (E.D. Va. Mar. 18, 2011)

36. As described herein, Experian engages in a highly regulated industry with specific federal statutory requirements that have been painstakingly detailed to them by courts, the FTC, and the Consumer Financial Protection Bureau. The statutory language has remained constant, and the warnings have been clear, consistent, and repeated for 50 years. Despite this knowledge and warning, Experian refuses to change its dispute reinvestigation procedure and just outsource consumer disputes to a related entity in Chile, issue an ACDV, and parrot the response. Experian has been sued for these actions thousands of times and perhaps even hundreds of thousands of times. Rather than invest more resources in consumer dispute reinvestigation, it maintains the same flawed procedures and then defends case or tries and force consumers to arbitration so that it can delay and win a war of attrition. Only a significant punitive damage award can stop this behavior to protect.

## COUNT I
### Fair Credit Reporting Act
### 15 U.S.C. §1681i

37. Plaintiff incorporates paragraphs one (1) through thirty-six (36) as if fully stated herein.

38. Defendant Experian has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA. Experian is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681i by failing to comply with the enumerated statutory provisions when Mr. Aliev disputed the accounts as described in the factual averments.

39.     Experian's reinvestigation procedures do not comply with the stated statutory requirements of 15 U.S.C. §1681i(a)(1) through §1681i(a)(5).

40.     §1681i(a)(1)(A) provides that upon notice of the dispute that Experian is obligated to: "conduct a reasonable reinvestigation to determine whether the dispute information is inaccurate."

41.     §1681i(a)(2) obligates Experian to: "provide notification of the dispute to any person who provided any item of information in dispute."

42.     §1681i(a)(4) details the scope of Experian's reinvestigation under paragraph (1) and makes clear that Experian Information Solutions, Inc. "shall review and consider all relevant information submitted by the consumer…with respect to such disputed information."

43.     Finally, §1681i(a)(5) provides that after Experian has completed the forgoing steps and reinvestigation that if: "an item of information is found to be inaccurate or incomplete or cannot be verified," Experian must delete or modify the information.

44.     Experian violated 15 U.S.C. §1681i(a)(1) by its conduct related to Mr. Aliev's disputes that it received as identified in the factual averments.  With regards to the disputes, Mr. Aliev identified the MECU account as an account that he did not open or initiate.  Discovery is necessary as to what exactly Experian did do after all of the disputes.  Prior cases have revealed that Experian does not have any records indicating why any action was taken by Experian as part of the dispute reinvestigation process.  Experian maintains limited documentary evidence as to what happened and then employs a professional witness whose man job function is to testify as to Experian's spin as to why certain actions were taken when in reality, Experian has no information as to why any action was taken by an employee or agent.  Experian has designed the dispute reinvestigation system for speed and automation, and Experian is not interested in conducting its

statutorily required reinvestigation on any more than the most basic of levels despite knowing the scourge of identity theft and how their limited investigation will never uncover whether an account was opened by an identity thief.

45.     Based upon documents reviewed to date, and Experian's own disclosure to Mr. Aliev as to what it did do, Experian simply issued ACDVs to MECU and did not conduct any other reinvestigation.

46.     Based upon information and belief, the only factual basis that Experian had at the time of Mr. Aliev's dispute reinvestigations were the ACDV responses back from MECU.

47.     This type of reinvestigation is a reckless and/or negligent reinvestigation because Experian fails to conduct an independent reinvestigation as required by the FCRA. In all of the disputes, Mr. Aliev identified the account as identity theft related and even named the thief in the first dispute. Subsequent disputes contained clear examples of his actual signature on his driver's license and the signature on the underlying account documents that are clearly on their face not even remotely close.

48.     The FCRA requires that in conducting its reinvestigation under 15 U.S.C. §1681i(a)(1)(A) that a credit reporting agency must conduct the reinvestigation after receiving the consumer's credit dispute letter and unless it is able to verify said information Experian must delete the disputed account from the credit file as stated in 15 U.S.C. §1681i(a)(5)(A):

> In general If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or **cannot be verified**, the consumer reporting agency shall- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer. 15 U.S.C. §1681i(a)(5)(A) (emphasis added)

49.     According to Black's Law Dictionary, the ordinary meaning of verify is, "to prove to be true; to confirm or establish the truth or truthfulness; to authenticate."

50.     Based upon the circumstances, Experian knew that there was a problem with the data on Mr. Aliev's credit file, knew that he did not open or initiate the MECU account, and knew that he did not sign the retail installment sales contract related to the loan account.

51.     Experian also violated 15 U.S.C. §1681i(a)(4) after receiving Mr. Aliev's disputes because it failed to review and consider the dispute information provided by Mr. Aliev including the representations that he did not open or initiate the accounts, that the accounts may have been identity theft related, and the account level documentation that he provided to Experian.

52.     Because Experian uses outsourced third-party processors located in Chile and other countries, Experian incentivizes low-cost review at the expense of detailed review and consideration of the specifics of the disputes.  These processors are not provided with adequate training and supervision so that they can execute the functions of §1681i(a)(4) and (5).  Worse yet, Experian does not trust these processors to decide if a disputed account is fraudulent or not and does not give them the authority to do so.

53.     Rather than allow these processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Experian automates that process and simply sends the ACDV response to its computer for automated updating and processing.

54.     As a result, Experian fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange.

55.     Experian negligently and recklessly implemented a system with a total disregard for the requirements of §1681i(a)(5).  Rather than allow these processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Experian automates that process and simply sends the ACDV response to its computer for automated updating and processing.

56.     Experian fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange without reasonably considering what information it had in front of it and what it could see was the cause of the disputed data.

57.     If Experian determined that the information was too difficult to verify for purposes of the dispute, the proper response is to delete the information as unverifiable.  Instead, Experian defaults to the furnisher's ACDV response no matter how ridiculous or inconsistent.

58.     Mr. Aliev suffered actual damages including time spent addressing the problem, improper denial of access to credit, inability to use his good credit, as well as emotional distress damages with attendant physical manifestations.  In addition, punitive damages are necessary based upon Experian's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

59.     Based upon information and belief and documents reviewed in other cases, Experian has a pattern and practice of failing to require the steps of a reasonable reinvestigation as required by the FCRA to circumvent its duties under the FCRA to conduct reinvestigations and keep the costs of dispute reinvestigations low.

60.     Experian has been on notice of its failure to reinvestigate properly by virtue of other cases and court opinions, and only the imposition of substantial punitive damages will change

Experian's policies.  Experian also knows that outsourced automated data conformity reviews do not comply with its grave responsibilities to assure maximum possible accuracy of consumer credit information.

## COUNT II
### Fair Credit Reporting Act
### 15 U.S.C. §1681e(b)

61.     Plaintiff incorporates paragraphs one (1) through sixty (60) as if fully stated herein.

62.     Defendant Experian has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Experian is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report.

63.     Experian willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Mr. Aliev when it provided a credit report to American Express in December 2023.  Discovery is necessary related to additional occasions that Experian issued inaccurate credit information as part of Experian's release of consumer information related to potential requests for credit.

64.     Experian's publishing of the inaccurate information was a substantial factor in the stress and strain from knowing that he was unable to use his credit in the manner that he had used his credit prior to the theft of his identity.

65.     The fraudulent MECU account was a substantial factor in Mr. Aliev's inability to obtain credit from American Express because Amex stated that his FICO score from Experian was 678 and therefore too low to qualify for the credit.

66.     Mr. Aliev suffered actual damages including time spent addressing the problem, improper denial of access to credit, loss of time spent trying to solve the problems related to his credit, frustration, upset, and emotional distress damages with attendant physical manifestations. In addition, punitive damages are necessary based upon Experian's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

67.     Punitive damages are necessary because Experian has implemented a system and process that it knows results with inaccurate credit reports being sold to furnishers because Experian fails to invest the resources into enacting procedures to protect consumers.  Experian has implemented procedures to allow inaccurate data to remain in its system that cannot be verified if reinvestigated properly.  Only punitive damages can curb this type of conduct that operates in reckless disregard for accurate credit reports.

## **Prayer for Relief**

Wherefore, the Plaintiff prays that the Court award the following relief:

a)      Actual damages based upon Defendant's violations of the FCRA;

b)      statutory damages against Defendant's based upon violations of the FCRA;

c)      punitive damages based upon the violations of the FCRA

d)      costs and reasonable attorneys' fees incurred by the Plaintiff;

e)      prejudgment interest

f)      all other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury as to all issues against all defendants.

Respectfully submitted,
Agalar Aliev

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Blankingship & Christiano, P.C.
11862 Sunrise Valley Dr. Suite 201
Reston, Virginia 20191
(571) 313-0412
Fax:(571) 313-0582